# In the United States Court of Federal Claims

No. 15-1563C
Filed October 4, 2016

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF WATER RESOURCES,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | 28 U.S.C. § 1491(a); Contract Disputes Act, 41 U.S.C. §§ 7101-09. |

*Matthew Goldman*, Deputy Attorney General, *Tracy L. Winsor*, Supervising Deputy Attorney General, *Kamala D. Harris*, Attorney General of California, Sacramento, CA, for plaintiff.

*Geoffrey M. Long*, Trial Attorney, *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC; *Koji Kawamura*, Attorney, Western Area Power Administration; *Tosh Sagar*, Attorney-Advisor, Department of the Interior, for defendant.

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

The California Department of Water Resources ("CDWR") brought this breach of contract action to recover scheduling coordinator charges arising from its operation of certain water storage and distribution facilities located in the State of California on behalf of the United States Bureau of Reclamation, pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101–09. The government has moved to dismiss this matter for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), and for failure to state a claim upon which relief may be granted, pursuant to RCFC 12(b)(6). For the reasons discussed below, the CDWR has not demonstrated that it has entered into a contract with the United States that falls within the scope of the CDA. And so, the Court **GRANTS** the government's motion to dismiss this matter for lack of subject-matter jurisdiction.

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. Background

In this Contract Disputes Act matter, the California Department of Water Resources, seeks to recover $10,473,957 in damages from the United States Bureau of Reclamation ("USBR") and the Western Area Power Administration ("WAPA"), as reimbursement for scheduling coordinator charges that the CDWR incurred in connection with its operation of certain water storage and distribution facilities ("Scheduling Coordinator Charges"). Compl. at ¶¶ 38, 100-101.

The CDWR maintains and operates the California State Water Project ("SWP"), which is a multipurpose water project that includes water storage facilities, aqueducts, pipe lines, pumping plants and power plants located in California. *Id*. at ¶ 3. The CDWR operates the Banks Pumping Plant, a state-owned facility, as part of the SWP. *Id*. at ¶ 92.

The USBR is responsible for the Central Valley Project ("CVP"), a federal multipurpose water project in California that includes the San Luis Unit, which consists of certain water storage and distribution facilities that are jointly used by the CDWR and the USBR ("Joint-Use Facilities") and certain water storage and distribution facilities that are used solely by the federal government ("Federal-Only Facilities"). Compl. at ¶¶ 4, 6; Def. Mot. at 4; Supp. Agreement, Art. 9(e), 22, Explanatory Recitals.

The CDWR operates and maintains the Joint-Use Facilities, and it periodically pumps federal water through the state-owned Banks Pumping Plant on behalf of the USBR. Compl. at ¶ 14. During the period 1998 to 2004, the CDWR paid Scheduling Coordinator Charges to the California Independent Systems Operator ("CAISO") to schedule energy for delivery to the Joint-Use Facilities and the state-owned facilities, including the Banks Pumping Plant, on behalf of the USBR. *Id*. at ¶¶ 38-39, 100-01.

---

[1] The facts recited in this Memorandum Opinion and Order are taken from the complaint ("Compl."); the government's motion to dismiss ("Def. Mot."); plaintiff's response to the government's motion to dismiss ("Pl. Resp."); the government's reply in support of its motion to dismiss ("Def. Rep."); the Joint Use Agreement ("Joint Use Agreement"); the Supplemental Agreement ("Supp. Agreement"), and the Coordinated Operation Agreement ("COA").

In this action, the CDWR seeks to recover the Scheduling Coordinator Charges that it paid on behalf of the USBR during the period 1998 to 2004 to operate the Joint-Use Facilities and the Banks Pumping Plant.[2] *Id.* at ¶¶ 100-01. The CDWR further alleges that the USBR and the WAPA are contractually obligated to reimburse the CDWR for a portion of these charges under three agreements that the CDWR and the United States entered into between 1961 and 1986. *Id.* at ¶¶ 91-92. A discussion of these agreements follows.

**1. The San Luis Act And The Joint Use Agreement**

In 1960, Congress enacted the San Luis Act, which authorized the Secretary of the Interior to "construct, operate, and maintain" the San Luis Unit. Pub. L. 86-488 at § 1, 74 Stat. 156. The Act provides that "for the principal purpose of furnishing water for the irrigation of approximately five hundred thousand acres of land. . . hereinafter referred to as the Federal San Luis [U]nit service area. . . the Secretary of the Interior is authorized to construct, operate and maintain the San Luis [U]nit." *Id*. at § 1(a). The Act further authorized the Secretary of the Interior to negotiate and enter into an agreement with the State of California to provide for the coordinated operation of the Joint-Use Facilities, so that the State may deliver water in areas located outside the Federal San Luis Unit service area without cost to the United States. *Id*. at § 2.

The San Luis Act provides that, if the Secretary and the State of California enter into such an agreement, the parties would design and construct the Joint-Use Facilities to permit "immediate integration and coordinated operation with the State's water projects." *Id*. at § 3(a). In this regard, the Act requires the State of California to "convey to the United States title to any lands, easements, and right-of-way which it then owns and which are required for the joint-use facilities." *Id*. at § 3(e). The Act also requires the State of California and the United States to each pay "an equitable share of the operation, maintenance, and replacement cost of the [J]oint-[U]se [F]acilities." *Id*. at § 3(d).

---

[2] The CDWR alleges that, to the extent that it is the federal agency responsible for the Central Valley Project, the Western Area Power Administration is liable to the CDWR for the Scheduling Coordinator Charges at issue in this case. Compl. at ¶¶ 5, 101.

Pursuant to the San Luis Act, the United States and the CDWR entered into the Joint Use Agreement in December 1961. *See generally* Joint Use Agreement. The explanatory recitals for the Joint Use Agreement provide, in pertinent part, that:

> [C]onstruction, operation, and maintenance of the joint-use facilities of the San Luis [U]nit will bring about substantial reductions in cost outlays otherwise required of both the State and the United States, will efficiently develop water resources for the benefit of the people of California and the United States, will provide incidental recreational opportunities, and will make possible the furnishing of water to water-short areas in both the Federal and State service areas at the earliest possible date.

*Id*. at Explanatory Recitals. Under the terms of the Joint Use Agreement, the United States is responsible for the construction of the Joint-Use Facilities and the State of California and the United States share the costs of construction. *Id*. at Art. 13(a), 16.

The Joint Use Agreement also requires that the State of California convey title to the land required for the Joint-Use Facilities to the United States. *Id*. at Art. 14. The agreement further provides that the State of California would begin operating and maintaining the Joint-Use Facilities after the facilities become operable. *Id*. at Art. 20(a), (d). In this regard, the agreement provides that the State of California and the United States would:

> [E]ach pay annually an equitable share of the operation . . . . The method of computation of the share to be paid by each agency shall be mutually agreed to by the State and the United States before the transfer of care, operation, and maintenance of joint-use facilities.

*Id*. at Art. 21(a). And so, under the Joint Use Agreement, the United States is responsible for a share of the costs related to the total cost of care, operation, maintenance and replacement of any joint-use facility. *Id*. at Art. 21(a).

**2. The Supplemental Agreement**

On January 12, 1972, the United States and the CDWR entered into the "Supplemental Agreement between the United States and the State of California for the Operation of the San Luis Unit" ("Supplemental Agreement") to resolve several outstanding issues related to the Joint Use Agreement. *See* Supp. Agreement, Explanatory Recitals; *see also* Compl. at ¶ 7. To that end, the Supplemental Agreement addresses certain requirements and responsibilities of the State of California and the United States in operating the Joint-Use and Federal-Only Facilities. *See* Supp. Agreement, Art. 12-16.

Specifically, under the Supplemental Agreement, the United States and the State of California are jointly responsible for preparing forecasts of proposed water and power operations related to the Joint-Use Facilities. *Id*. at Art. 11. The agreement also requires that each party supply the power necessary to pump its own water at certain Joint-Use Facilities. *Id*. at Art. 17. In addition, the Supplemental Agreement provides that the State of California is "responsible for reading, maintaining, and repairing meters necessary for capacity, energy, and reactive measurements at" certain Joint-Use Facilities. *Id*. at Art. 27. The agreement also provides that "the costs of the care, operation, maintenance, and replacement of the joint-use facilities . . . shall be allocated 55 percent to the State and 45 percent to the United States." *Id*. at Art. 34(b).

The Supplemental Agreement also sets forth the obligations of the State of California and the United States with respect to certain facilities which are also part of the San Luis Unit. *Id*. at Explanatory Recitals, Art. 22. In this regard, the agreement provides that "the State shall operate and maintain certain facilities which are part of the Federal San Luis Unit, but are not part of the joint-use facilities, upon the terms set forth in [the] supplemental agreement." *Id*. at Explanatory Recitals. The Supplemental Agreement further provides that the United States will be charged for all costs "incurred by the State chargeable to the Federal-only facilities." *Id*. at Art. 34(a); *see also* Pl. Resp. at 14.

### 3. The Coordinated Operation Agreement

Lastly, on October 27, 1986, President Reagan signed into law Public Law 99-546, which authorized the Secretary of the Interior to enter into an agreement with the State of California for the coordinated operation of the CVP and the SWP. Pub. L. 99-546 § 103, 100 Stat. 3050; *see* Compl. at ¶ 8. Pursuant to this legislation, the CDWR and the United States entered into the "Agreement Between the United States of America and the Department of Water Resources of the State of California for Coordinated Operation of the Central Valley Project and the State Water Project" ("COA") on November 24, 1986. *See generally* COA.

The COA provides that the United States and the CDWR will coordinate the operation of the CVP and the SWP. *Id*. at Art. 2, 6(a)(1). To that end, the agreement further provides that the State of California and the United States are "dedicated to utilizing their existing and future water conservation facilities so as to provide the maximum benefits to the people of California and the Nation and believe that through the coordinated and cooperative operation of State and

Federal facilities, these benefits can be maximized." *Id*. at Art. 2. The COA also addresses how the CDWR and the United States will coordinate operations for the CVP and the SWP to meet the legal uses of water, maintain annual water supplies and make available water storage withdrawals. *Id*. at Art. 3(a), 6(a)(1), 6(c), (d), (g). In this regard, Article 10(a) of the COA provides that "[e]ither party may make use of its facilities available to the other party for pumping and conveyance of water by written agreement." *Id*. at Art. 10(a).

**4. The California Independent System Operator**

On March 1, 1998, the State of California established the California Independent System Operator to act as a balancing authority that manages the flow of electricity across the power transmission lines that make up the bulk of the state's power grid. Compl. at ¶ 12; Def. Mot. at 9. To that end, the CAISO manages the balance between electricity generation and demand for the state. Compl. at ¶ 12. The CAISO also requires participants in the state's energy markets to schedule their purchases and sales for transmission on the CAISO-managed grid. *Id.* at ¶ 13; Def. Mot. at 9. Only scheduling coordinators−CAISO-certified participants that agree to perform functions in line with CAISO procedures and rules−or those that enlist the services of a scheduling coordinator, may participate in the CAISO market. Compl. at ¶ 13; Def. Mot. at 9. The "CAISO charges scheduling coordinators a wide range of fees and penalties related to transacting energy in the CAISO market and transmitting" energy *via* the CAISO-managed grid. Compl. at ¶ 34.

Specifically relevant to this dispute, in 1998, the CDWR entered into a scheduling coordinator agreement with the CAISO in order to participate in the CAISO market. *Id.* at ¶ 14. Under that agreement, the CAISO certified the CDWR as a scheduling coordinator for the SWP, including the Banks Pumping Plant, and the Joint-Use Facilities. *Id.* Since 1998, the CDWR has been performing the responsibilities of the scheduling coordinator for the Joint-Use Facilities and the Banks Pumping Plant. *Id.* And so, since 1998, the CDWR has incurred the fees and other costs associated with scheduling energy purchases and sales on behalf of the USBR for the Joint-Use Facilities and the Banks Pumping Plant. *Id.* at ¶ 36.

**5. The CDWR's Certified Claim**

Prior to commencing this litigation, the CDWR submitted a certified claim to the USBR and the WAPA to recover the Scheduling Coordinator Charges that it incurred on behalf of the

USBR for the Joint-Use Facilities and the Banks Pumping Plant. Compl. at Ex. 1. In its claim, the CDWR sought to recover $10,473,957 in costs related to the Scheduling Coordinator Charges that the CDWR maintains that it has incurred on behalf of the United States. *Id*. at ¶ 98, Ex. 1.

On January 7, 2015, a contracting officer denied the CDWR's claim upon the grounds that, among other things: (1) the contracts that the CDWR relied upon to bring its claim are not subject to the CDA; (2) the CDWR's claim is time barred; and (3) the Scheduling Coordinator Charges are not covered by the contracts. *Id*. at ¶ 99, Ex. 4. This litigation commenced thereafter.

### B. Procedural History

The CDWR filed the complaint in this matter on December 22, 2015. *See generally* Compl. On March 7, 2016, the government filed a motion to dismiss for lack of subject-matter jurisdiction, pursuant to RCFC 12(b)(1), and for failure to state a claim upon which relief may be granted, pursuant to RCFC 12(b)(6). *See generally* Def. Mot.

On April 21, 2016, the CDWR filed a response and opposition to the government's motion to dismiss. *See generally* Pl. Resp. The government filed a reply in support of its motion to dismiss on June 10, 2016. *See generally* Def. Rep. The Court held oral argument on the government's motion to dismiss on September 27, 2016. *See generally* Tr. The matter having been fully briefed, the Court resolves the pending motion to dismiss.

## III. STANDARDS FOR DECISION

### A. RCFC 12(b)(1)

When deciding a motion to dismiss upon the ground that the Court does not possess subject-matter jurisdiction pursuant to RCFC 12(b)(1), this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also* RCFC 12(b)(1). But, plaintiff bears the burden of establishing subject-matter jurisdiction, and plaintiff must do so by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). And so, should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006).

In this regard, the United States Court of Federal Claims is a court of limited jurisdiction and "possess[es] only that power authorized by Constitution and statute . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The Tucker Act grants the Court jurisdiction over:

> [A]ny claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act, however, is a "jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976). And so, to pursue a substantive right against the United States under the Tucker Act, a plaintiff must identify and plead a money-mandating constitutional provision, statute, or regulation; an express or implied contract with the United States; or an illegal exaction of money by the United States. *Cabral v. United States*, 317 F. App'x 979, 981 (Fed. Cir. 2008) (citing *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005)); *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005). "[A] statute or regulation is money-mandating for jurisdictional purposes if it 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s].'" *Fisher*, 402 F.3d at 1173 (quoting *United States v. Mitchell*, 463 U.S. 206, 217 (1983)) (brackets in original).

**B. RCFC 12(b)(6)**

When deciding a motion to dismiss based upon failure to state a claim upon which relief may be granted pursuant to RCFC 12(b)(6), this Court must also assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the non-movant's favor. *Erickson*, 551 U.S. at 94; *see also* RCFC 12(b)(6). To survive a motion to dismiss pursuant to RCFC 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And so, when the complaint fails to "state a claim to relief that is plausible on its face," the Court must dismiss the complaint. *Iqbal*, 556 U.S. at 678 (citation omitted). On the other hand, "[w]hen there are well-pleaded factual allegations, a court should

assume their veracity" and determine whether it is plausible, based upon these facts, to find against defendant. *Id*. at 679.

**C. The Contract Disputes Act**

The Contract Disputes Act is a money-mandating statute, and so, this Court possesses jurisdiction to consider claims arising under the CDA. *Palafox St. Assoc., L.P. v. United States*, 114 Fed. Cl. 773, 780; 41 U.S.C. §§ 7101-09. In order to bring a CDA claim in this Court, a plaintiff must meet two prerequisites. First, a plaintiff must have submitted a proper claim to the relevant contracting officer, which must be properly certified if the amount requested exceeds $100,000. 41 U.S.C. § 7103(a)-(b); *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575-76 (Fed. Cir. 1995); *RSH Constructors, Inc. v. United States*, 14 Ct. Cl. 655, 657 (1988). Second, a plaintiff must have obtained either an actual or a deemed final decision on that claim. 41 U.S.C. §§ 7103-04; *Orbas & Assocs. v. United States*, 26 Cl. Ct. 647, 649 (1992) ("Absent an actual or 'deemed' final decision, this [C]ourt cannot exercise jurisdiction over the controversy."); *Claude E. Atkins Enters., Inc. v. United States*, 27 Fed. Cl. 142, 143 (1992).

In addition, the United States Court of Appeals for the Federal Circuit has long recognized that the CDA does not apply to every government contract. *G.E. Boggs & Assocs., Inc. v. Roskens*, 969 F.2d 1023, 1026 (Fed. Cir. 1992); *see also Anchor Tank Lines, LLC v. United States*, 127 Fed. Cl. 484, 495 (2016). Rather, the CDA applies only to contracts made by an executive agency for:

(1) the procurement of property, other than real property in being;
(2) the procurement of services;
(3) the procurement of construction, alteration, repair, or maintenance of real property; or
(4) the disposal of personal property.

41 U.S.C. § 7102(a). And so, only a "conventional contract for the direct procurement of property, services and construction, to be used directly by the [g]overnment" is covered by the CDA. *Delta S.S. Lines v. United States,* 3 Cl. Ct. 559, 569 (1983); *see also Lublin Corp. v. United States*, 84 Fed. Cl. 678, 683 (2008) ("[C]ourts have refused to stretch the language of the CDA to cover contracts that do not arise from a typical 'acquisitive' relationship and the expenditure of appropriated funds or some other exchange of recognized value. . . .").

To determine whether a contract falls within the purview of the CDA, the Court looks first to the definition of the term procurement and then the Court examines the purpose and legislative history of the CDA. *See Int'l Indus. Park, Inc. v. United States*, 95 Fed. Cl. 63, 67 (2010) ("To determine if the contract is one for the procurement of property, the Court . . . will examine the definition of 'procurement' [and] . . . the purpose and legislative history of the CDA."). Although the term procurement is not defined in the CDA, the Office of Federal Procurement Policy Act has defined procurement to mean "all stages of the process of acquiring property or services." *See* 41 U.S.C. § 111; *Int'l Indus. Park,* 95 Fed. Cl. at 67. The United States Court of Appeals for the Federal Circuit has also held that the term procurement refers to the "acquisition by purchase, lease or barter, of property or services for the *direct benefit or use* of the Federal Government." *New Era Constr. v. United States,* 890 F.2d 1152, 1157 (Fed. Cir. 1989), *reh'g denied* (Fed. Cir. 1990) (emphasis in original, citation omitted); *see also Laudes Corp. v. United States,* 86 Fed. Cl. 152, 161 (2009).

With regards to the purpose and legislative history of the CDA, the Federal Circuit has held that:

> [E]ven where a statute is clear on a purely linguistic level, interpretation may be necessary if that interpretation does not do justice to the realities of the situation. . . . To determine whether the applicability of the CDA to the pleaded contracts is within the intention of Congress, we must look to the purpose of the Act and its legislative history.

*Institut Pasteur v. United States*, 814 F.2d 624, 627 (Fed. Cir. 1987) (quoting *Texas State Comm'n for the Blind v. United States*, 796 F.2d 400, 406 (Fed. Cir. 1986)). In this regard, the Federal Circuit has also held that:

> The CDA is an implementation of recommendations made by the Commission on Government Procurement, created by Congress in 1969, to promote economy, efficiency, and effectiveness in the procurement of goods, services and facilities by and for the executive branch of the Federal Government by—
>
> > (1) establishing policies, procedures, and practices which will require the Government to acquire goods, services, and facilities of the requisite quality and within the time needed at the lowest reasonable cost, utilizing competitive bidding to the maximum extent practicable. . . .

*Id*. (quoting Pub. L. 91-129, § 1, 83 Stat. 269, as amended by Pub. L. 92-47, 85 Stat. 102). The Federal Circuit also noted that the Senate Report on the CDA states that:

> Both [the economy of our society and the success of many major Government programs] can be affected by the existence of competition and quality contractors—or by the lack thereof. The way potential contractors view the disputes-resolving system influences how, whether, and at what prices they compete for Government contract business.

*Id*. (quoting S. Rep. 95-1118 (1978)) (brackets in original). And so, the Court looks to whether the contract comports with the cost and competition policy considerations set forth in the legislative history for the CDA to determine whether a contract falls within the scope of the Act. *Id.*; *see also Anchor Tank Lines*, 127 Fed. Cl. at 495.

In addition, this Court has recognized that the CDA should not apply "where application of complex, burdensome, and inevitably time-consuming procurement regulations . . . would 'not do justice to the realities of the situation.'" *Institut Pasteur*, 814 F.2d at 627 (citing *Texas State Comm'n for the Blind*, 796 F.2d at 406). The Federal Circuit has also held that cooperative agreements are typically not considered procurement contracts that fall under the purview of the CDA. *Rick's Mushroom Serv., Inc. v. United States*, 76 Fed. Cl. 250, 258 (2007), *aff'd* 521 F.3d 1338 (Fed. Cir. 2008) (upholding the trial court's analysis but not specifically addressing the trial court's cooperative agreement analysis or reliance upon 31 U.S.C. § 6305).

## IV. LEGAL ANALYSIS

The government has moved to dismiss this Contract Disputes Act action upon the ground that the agreements relied upon by the CDWR are not contracts that fall within the purview of the CDA. *See generally* Def. Mot. In its opposition to the government's motion to dismiss, the CDWR counters that the Court possesses jurisdiction to consider its CDA claim, because the claim is based upon government contracts for the procurement of property, services, or the construction, alteration, repair, or maintenance of real property. *See generally* Pl. Resp. For the reasons discussed below, the CDWR has not demonstrated that the relevant agreements fall within the purview of the CDA. And so, the Court must dismiss this action for lack of subject-matter jurisdiction. RCFC 12(b)(1).

**A. The Agreements Are Not Contracts For The Procurement Of Property, Services, Or The Construction, Repair Or Maintenance Of Real Property**

As an initial matter, a plain reading of the Joint Use Agreement, the Coordinated Operation Agreement and the Supplemental Agreement demonstrates that these agreements are not contracts for the procurement of services, property, or the construction, alteration, repair, or maintenance of real property that could fall within the scope of the Contract Disputes Act. It is well established that when determining whether the CDA applies to a contract, the Court applies a two-step analysis. First, the Court considers whether the contract at issue is made by an executive agency for the procurement of property, services, the construction, alteration, repair, or maintenance of real property, or the disposal of personal property. 41 U.S.C. § 7102(a). If the contract at issue involves such a procurement, the Court then examines whether the contract comports with the legislative history of the CDA. *Institut Pasteur*, 814 F.3d at 627. For the reasons discussed below, the contracts at issue in this dispute do not satisfy either step in the Court's analysis.

**1. The Joint Use Agreement Is Not A Contract For The Procurement Of Property, Services, Or The Construction, Alteration, Repair, Or Maintenance Of Real Property**

A reading of the Joint Use Agreement makes clear that the purpose of this agreement is not to procure services, property, or the construction, alteration, repair, or maintenance of real property. Rather, the purpose of this agreement is plainly stated in the agreement's explanatory recitals, which provide, in pertinent part, that:

> [C]onstruction, operation, and maintenance of the joint-use facilities of the San Luis unit will bring about substantial reductions in cost outlays otherwise required of both the State and the United States, will efficiently develop water resources for the benefit of the people of California and the United States, will provide incidental recreational opportunities, and will make possible the furnishing of water to water-short areas in both the Federal and State service areas at the earliest possible date.

Joint Use Agreement, Explanatory Recitals. And so, the purpose of the Joint Use Agreement is to reduce the costs to be incurred by the United States and the State of California for the operation and maintenance of water storage and distribution facilities and to efficiently develop water resources in the State of California to benefit the public.

The language of the Joint Use Agreement also makes clear that this agreement is intended to facilitate the sharing of responsibilities and costs associated with the construction and operation of the Joint-Use Facilities between the State of California and the United States. *See generally id*. In this regard, the Joint Use Agreement provides that the United States is responsible for the construction of the Joint-Use Facilities and that the State of California and the United States will share the costs associated with the construction of the Joint-Use Facilities. *Id*. at Art. 13(a), 16. The agreement further provides that, after construction is complete, the State of California will operate the facilities and that the State and the United States will share the costs associated with operating the facilities. *Id*. at Art. 20(a), (d), 21(a) ("The State of California and the United States will each pay annually an equitable share of the operation [of the joint-use facilities]."). And so, the text of this agreement demonstrates that the State of California with a cost-effective opportunity to use the Joint-Use Facilities to develop water resources for the benefit of the public. *See* Joint Use Agreement.

Given the plain language of the Joint Use Agreement, the CDWR's argument that this agreement is a government contract for either the procurement of construction, alteration, repair, or maintenance services is simply without merit. First, with respect to CDWR's argument that the Joint Use Agreement is a contract for the procurement of construction services, the agreement clearly provides that the construction of the Joint-Use Facilities will be performed by the United States. *Id*. at Art. 13(a), 16. It is without dispute that the State of California did not provide any construction services to the United States related to the construction of the Joint-Use Facilities. In this regard, this Court has long recognized that, "[b]y its terms, the CDA does not apply to the provision of services by the government, but only to the procurement of such services." *Fl. Power & Light Co. v. United States*, 307 F.3d 1364, 1371 (Fed. Cir. 2002). And so, the Joint Use Agreement cannot be reasonably construed to be a contract for the procurement of construction services under the CDA.

The CDWR's argument that the Joint Use Agreement is a contract for the procurement of repair and maintenance services is similarly without merit. *See* Tr. at 42-43, 61. The agreement makes clear that the State of California and the United States will share the cost of operating and maintaining the Joint-Use Facilities. Joint Use Agreement, Art. 21(a). The agreement also makes clear that the State of California may use these facilities for the state's own purpose and benefit. *Id*. at, *e.g*., Explanatory Recitals, Art. 19. Given this, the Joint Use Agreement cannot

be reasonably construed to be a contract for the procurement of repair or maintenance services under the CDA.

In addition, the provisions of the Joint Use Agreement also demonstrate that this agreement is the kind of cooperative agreement that the Court has traditionally found to fall outside the scope of the CDA. *See Int'l Indus. Park*, 95 Fed. Cl. at 69; *see also Bailey v. United States*, 46 Fed. Cl. 187, 211 (2000).[3] Title 31, United States Code, Section 6305 defines a cooperative agreement as an agreement between a state, local government, or other recipient and an executive agency, for which the principal purpose of the agreement is to transfer a thing of value to the recipient and where substantial involvement between the executive agency and the recipient in carrying out the activity contemplated by the agreement is expected to occur. 31 U.S.C. § 6305. The Joint Use Agreement is such an agreement. The agreement provides that the United States will "transfer a thing of value" to the State of California, namely, the ability to use the Joint-Use Facilities to deliver water outside of the San Luis Unit federal service area for the benefit of the public. *Id.*; *see generally* Joint Use Agreement; Pub. L. 86-488 §§ 1-4; *see also* Tr. at 7, 32. The agreement similarly provides that the United States and the State of California will both be substantially involved in carrying out the activities contemplated by the Joint Use Agreement, as the United States will construct the Joint-Use Facilities and the State of California will operate and maintain these facilities. *See generally* Joint Use Agreement; 31 U.S.C. § 6305.

---

[3] Title 31, United States Code, section 6305 provides that:

> An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the [United States Government] and a State, a local government, or other recipient when—
>
> > (1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and
> >
> > (2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

31 U.S.C. § 6305; *see Rick's Mushroom Serv.*, 76 Fed. Cl. at 257-58; *see also Trauma Serv. Group, Ltd. v. United States*, 33 Fed. Cl. 426, 429-30 (1995) (differentiating between cooperative agreements and procurement contracts).

In *Rick's Mushroom Serv. v. United States,* this Court held that a similar kind of agreement was a cooperative agreement that fell outside the scope of the CDA. In that case, the Court held that an agreement between a mushroom grower and the Department of Agriculture, pursuant to which the mushroom grower would construct and operate a facility according to Department of Agriculture specifications in return for cost-share payments, is not considered to be a contract that falls under the purview of the CDA. 76 Fed. Cl. at 258. Specifically, the Court determined that the principal purpose of the agreement in *Rick's Mushroom* was "to 'carry out a public purpose of support or stimulation authorized by a law of the United States.'" *Rick's Mushroom Serv*., 76 Fed. Cl. at 258 (quoting 31 U.S.C. § 6305). The agreement in *Rick's Mushroom* also required substantial involvement between the Department of Agriculture and the mushroom grower for construction of the facility at issue. *Id*. at 253. And so, like the agreement *in Rick's Mushroom,* the Joint Use Agreement at issue here is akin to a cooperative agreement between the State of California and the United States that does not fall within the purview of the CDA. *Id*. at 258; 31 U.S.C. § 6305.

**2. The COA Is Not A Contract For The Procurement Of Services**

A plain reading of the Coordinated Operation Agreement similarly demonstrates that this agreement is not a contract for the procurement of services. In its opposition to the government's motion to dismiss, the CDWR argues that the COA is a contract for the procurement of services, because this agreement permits the United States to use the Banks Pumping Plant, and other state-owned water storage and distribution facilities, to pump and convey federal water. Pl. Resp. at 5; COA, Art. 10(a). To support this argument, the CDWR points to Article 10(a) of the COA, which provides that "either [the State of California or the United States] may make use of its facilities available to the other party for pumping and conveyance of water by written agreement." COA, Art. 10(a). The CDWR's reliance upon this provision is misplaced.

Again, a plain reading of the agreement shows that the United States is not procuring any services under the COA. Rather, Article 10 of the COA simply permits the State of California and the United States to use the other's water storage and distribution facilities if the parties agree and enter into a separate agreement. COA, Art. 10(a). This provision simply does not

create any obligation upon the State of California to provide a service to the United States. *Id*. And so, the COA cannot be read to be a contract for the procurement of services.

**3. The Supplemental Agreement Is Not A Contract For The Procurement Of Services, Property, Or The Construction, Alteration, Repair, Or Maintenance Of Real Property For The Joint-Use Facilities**

The CDWR's arguments with respect to the final agreement at issue in this matter −the Supplemental Agreement−suffer from many of the same deficiencies discussed above. Much like the Joint Use Agreement and the COA, the primary purpose of the Supplemental Agreement is to clarify the responsibilities and obligations of the State of California and the United States with respect to the operation, maintenance and cost-sharing for water storage and distribution facilities. *See* Supp. Agreement, Explanatory Recitals. The Supplemental Agreement also addresses the operation and maintenance of certain Federal-Only Facilities for water storage and distribution. *See* Supp. Agreement, Explanatory Recitals, Art. 12-16; *see also* Compl. at ¶ 7.

With respect to these Federal-Only Facilities, the CDWR argues that the Supplemental Agreement is a contract for the procurement of services, because the agreement requires that the CDWR operate the Federal-Only Facilities for the sole benefit of the United States. Pl. Resp. at 11-14; *see Oroville-Tonasket Irrigation District v. United States*, 33 Fed. Cl. 14, 22 (1995) (citing 29 C.F.R. § 4.130(a)(38)). The CDWR's argument is a reasonable one. In fact, this Court has held previously that the "operation, maintenance, or logistic support of a Federal facility" is a typical "service" for which the government contracts under the CDA. *See Oroville-Tonasket Irrigation District*, 33 Fed. Cl. at 22 (citing 29 C.F.R. § 4.130(a)(38)); *cf. New Era Constr.*, 890 F.2d at 1157 (holding that "procurement" refers to the "acquisition by purchase, lease or barter, of property or services for the *direct benefit or use* of the Federal Government.") (citation omitted).

But, the weakness in CDWR's argument is that the CDWR's claim here is not based upon the services that the State of California provided at the Federal-Only Facilities. *See* Compl. at ¶¶ 100-01; Tr. at 9-10, 39. In fact, it is undisputed that the State of California did not pay the Scheduling Coordinator Charges incurred for the Federal-Only Facilities. Compl. at ¶ 5; Ex. 4; Tr. at 39. And so, to the extent that the Supplemental Agreement can be construed as a contract

for the procurement of services, this agreement cannot be the basis for the CDWR's CDA claim in this case. Compl. at ¶ 100.

**B. The CDA's Legislative History Also Demonstrates That The Act Does Not Apply To The Subject Agreements**

Even if the three agreements discussed above could be construed to be contracts for the procurement of services, property, or the construction, alteration, repair, or maintenance of real property under the CDA, the legislative history of the CDA demonstrates that the agreements do not fall within the scope of the Act. *See Int'l Indus. Park*, 95 Fed. Cl. at 67 ("To determine if the contract is one for the procurement of property, the Court . . . will examine the definition of 'procurement' [and] . . . the purpose and legislative history of the CDA.").

As a threshold matter, the agreements do not implicate the cost and competition policy considerations underlying the CDA. In *Institut Pasteur*, the United States Court of Appeals for the Federal Circuit held that "[t]o determine whether the applicability of the CDA to the pleaded contracts is within the intention of Congress, we must look to the purpose of the Act and its legislative history." 814 F.2d at 627. With respect to the CDA's legislative history, the Federal Circuit observed that the recommendations to Congress of the Commission on Government Procurement proposed that Congress:

> (1) establish[ ] policies, procedures, and practices which will require the Government to acquire goods, services, and facilities of the requisite quality and within the time needed at the lowest reasonable cost, utilizing competitive bidding to the maximum extent practicable . . . .

*Id*. (citing Pub. L. No. 91–129, § 1, 83 Stat. 269, as amended by Pub. L. No. 92–47, 85 Stat. 102). The Senate Report accompanying the legislation that would become the CDA also emphasized the need to promote competition and attract quality contractors. *See* S. Rep. 95-1118. The Senate Report provides that "'[t]he way potential contractors view the disputes-resolving system influences how, whether, and at what prices they compete for Government contract business.'" 814 F.2d at 627 (quoting S. Rep. 95-1118). And so, the Federal Circuit determined that Congress intended to promote certain cost and competition policy considerations by enacting the CDA. *Id.* at 627-28.

Such policy considerations do not apply to the agreements at issue here. First, it is without dispute that the agreements at issue are not the result of competitive bidding for a

government contract. Tr. at 51; Pl. Resp. at 18, 32-33. Rather, the parties to the agreements have been statutorily prescribed in the San Luis Act and Public Law 99-546. *See generally* Pub. L. 86-488; Pub. L. 99-546; Tr. at 51. And so, the fact that the agreement have been mandated by statute makes clear that typical competition policy considerations are not at issue here.

In addition, the exclusion of the subject agreements from coverage under the CDA neither impairs nor promotes Congress's intent to "design[ ] an efficient disputes resolution system to encourage quality contractors to competitively provide goods and services to the U.S. [G]overnment. . . ." *G.E. Boggs & Assocs.*, 969 F.2d at 1028. Only the State of California could enter into these specific agreements with the United States. Pub. L. 86-488; Pub. L. 99-546; Tr. at 51. Given this, the CDA's dispute resolution procedure is not implicated by these agreements. No other contractors would have been eligible to compete for the award of these contracts, nor would there be a need to resolve disputes arising under the agreements according to the CDA. *See Institut Pasteur,* 814 F.2d at 627 (quoting S. Rep. 95-1118 (1978) ("'[t]he way potential contractors view the disputes-resolving system" would "influence[ ] how, whether, and at what prices they compete for Government contract business."). In fact, the agreements provide for a separate dispute resolution process. *See* COA, Art. 10(h)(5) (providing that the parties may negotiate for a unilateral termination of the agreement).

Third, the application of the federal procurement regulations to the agreements at issue would also "'not do justice to the realities of the situation'" in this case. *Institut Pasteur*, 814 F.2d at 628 (quoting *Texas State Comm'n for the Blind*, 796 F.2d at 406); *see also Int'l Indus. Park*, 95 Fed. Cl. at 69. For example, the application of Federal Acquisition Regulation ("FAR") Subpart 9.1−which requires that a contracting officer make an affirmative determination of responsibility with respect to the prospective awardee of a government contract−would be inappropriate under the circumstances presented here. *See* 48 C.F.R. § 9.103 ("No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility"). Indeed, it would be illogical to require a contracting officer to make a FAR 9.1 determination within the context of the subject agreements, because Congress has enacted legislation that expressly provides that the United States and the State of California enter into agreements to provide for the coordinated operation of the Joint-Use Facilities and the Banks Pumping Plant. Pub. L. 86-488; Pub. L. 99-546.

Lastly, applying the federal regulations pertaining to contracting on a noncompetitive basis to these agreements would be equally inappropriate. As discussed above, the agreements at issue have been entered into pursuant to legislation enacted by Congress. *See* Pub. L. 86-488; Pub. L. 99-546; compare with 48 C.F.R. §§ 6.301, 6.303-1 (allowing for the award of a contract when there is other than full and open competition if the government writes a justification for contracting on a noncompetitive basis). And so, applying such procurement regulations in these circumstances simply would not do justice to the realities of the situation.

In sum, a plain reading of the agreements relied upon by the CDWR to bring its CDA claim demonstrates that these agreements are not the type of contracts that the Congress intended to fall within the scope of the CDA. *Institut Pasteur*, 814 F.2d 627-28. Given this, the CDWR has not met its burden to demonstrate that the Court possesses subject-matter jurisdiction to consider its CDA claim. RCFC 12(b)(1).[4] And so, the Court must grant the government's motion to dismiss and dismiss the CDWR's claim. RCFC 12(b)(1).

## V. CONCLUSION

Because the CDWR has not met its burden to show that any of these agreements at issue in this dispute are covered by the Contract Disputes Act, the CDWR has not established that the Court possesses subject-matter jurisdiction to consider its claim. And so, for the foregoing reasons, the Court **GRANTS** the government's motion to dismiss for lack of subject-matter jurisdiction.

The Clerk is directed to enter judgment accordingly.

Each party to bear its own costs.

**IT IS SO ORDERED.**

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge

[4] The government also argues that the CDWR has failed to state a claim upon which relief may be granted with respect to the portion of plaintiff's claim that pertains to the Banks Pumping Plant. Because the Court concludes that it does not have subject-matter jurisdiction to consider this claim, the Court does not address the government's motion pursuant to RCFC 12(b)(6).